United States Courts
Southern District of Texas
FILED

JUL 1 1 2016

David J. Bradley, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § § | |
| v. § § § | Criminal No. **16 CR 0 3 0 1** |
| FAYE H. JACOB, § § | |
| Defendant. § | |

## INFORMATION

The United States Attorney for the Southern District of Texas charges:

### General Allegations

At all times material to this Information, unless otherwise specified:

1. The Medicare Program ("Medicare") was a federal healthcare program providing benefits to individuals who were over the age of 65 or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Medicare was a "healthcare benefit program" as defined by Title 18, United States Code, Section 24(b).

2. Medicare was subdivided into multiple Parts. Medicare Part B covered partial hospitalization programs ("PHPs") connected with the treatment of mental illness. The treatment program of PHPs closely resembled that of a highly structured, short-term hospital inpatient program, but it was a distinct and organized intensive treatment program that offered less than 24-hour daily care.

3. Patients eligible for Medicare coverage of a PHP comprised two groups: (1) those patients who were discharged from an inpatient hospital treatment program, and the PHP is

in lieu of continued inpatient treatment; and (2) those patients who, in the absence of partial hospitalization, would require inpatient hospitalization.

4. Medicare guidelines required that patients admitted to a PHP required PHP services at levels of intensity and frequency comparable to patients in an inpatient setting for similar psychiatric illnesses.

5. Under the PHP benefit, Medicare covered the following services: (1) individual and group psychotherapy with physicians, psychologists or other mental health professionals; (2) occupational therapy requiring the skills of a qualified occupational therapist; (3) services of social workers, trained psychiatric nurses and other staff trained to work with psychiatric patients; (4) drugs and biologicals furnished for therapeutic purposes that could not be self-administered; (5) individualized activity therapies that were not primarily recreational or diversionary; (6) family counseling services for which the primary purpose was the treatment of the patient's condition; (7) patient education programs where the educational activities were closely related to the care and treatment of the patient; and (8) diagnostic services.

6. Medicare guidelines specifically excluded meals and transportation from coverage under the PHP benefit.

7. Medicare did not cover programs providing primarily social, recreational or diversionary activities. Medicare excluded from coverage programs attempting to maintain psychiatric wellness and treatment of chronic conditions without acute exacerbation. Psychosocial programs that provided only a structured environment, socialization or vocational rehabilitation were not covered by Medicare.

8. Medicare required that the PHP was provided at a facility that was hospital based or hospital affiliated or at a community mental health center.

9.  Individuals who qualified for Medicare benefits were commonly referred to as Medicare "beneficiaries." Each beneficiary was given a Medicare identification number.

10. Hospitals, physicians and other healthcare providers that provided services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an application in which the providers agreed to comply with all Medicare related laws and regulations. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number." A healthcare provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for services rendered to beneficiaries.

11. Medicare paid hospitals and other healthcare providers for services rendered to beneficiaries. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare, either directly or through a billing company.

12. CMS contracted with Medicare Administrative Contractors ("MACs") to process claims for payment. The MAC that processed and paid Medicare Part B claims for PHP services in Texas was TrailBlazer Health Enterprises, LLC ("TrailBlazer").

13. To bill Medicare for services rendered, a provider submitted a claim form (Form 1500) to TrailBlazer. When a Form 1500 was submitted, usually in electronic form, the provider certified that: (1) the contents of the form were true, correct and complete; (2) the form was prepared in compliance with the laws and regulations governing Medicare; and (3) the contents of the claim were medically necessary.

14. A Medicare claim for PHP reimbursement was required to set forth the following, among other things: the beneficiary's name and unique Medicare identification number; the item or service provided to the beneficiary; the date the item or service was provided; the cost of the

item or service; and the name and unique physician identification number of the physician who prescribed or ordered the item or service.

15. The Medicaid program is a state-administered health insurance program funded by the United States Government and by the State of Texas. The Medicaid program helps pay for reasonable and necessary medical procedures and services provided to individuals who are deemed eligible under state low-income programs. The Texas Medicaid program is a cooperative federal-state program to furnish medical assistance to the indigent. Among the type of reimbursable medical assistance to covered persons is PHP treatment.

16. The State of Texas contracts with Texas Medicaid & Healthcare Partnership to process and pay claims submitted by health care providers.

17. The Medicaid Program in Texas may pay a portion of a claim originally submitted to Medicare in the event the patient has both Medicare and Medicaid coverage. This portion is generally 20 percent of the Medicare allowance for the billed charge. Such claims are sent to Medicaid once processed by Medicare. Medicaid will pay its portion if Medicare originally allowed the claim.

18. A Houston hospital ("the Hospital") was a Texas non-profit entity doing business in and around Houston, Texas. The Hospital billed Medicare for PHP services purportedly provided at the Hospital locations and for PHP services purportedly provided by independent contractors at satellite locations.

19. Defendant **FAYE H. JACOB**, a resident of Harris County, Texas, owned several group homes and was a patient recruiter for Bright Star Healthcare PHP ("Bright Star PHP"), a satellite location of the Hospital.

**COUNT 1**
**Conspiracy to Defraud the United States and to**
**Pay and Receive Health Care Kickbacks**
**(18 U.S.C. § 371)**

20. Paragraphs 1 through 19 of this Information are realleged and incorporated by reference as if fully set forth herein.

21. From in or around 2010, through in or about 2012, the exact dates being unknown, in the Houston Division of the Southern District of Texas, and elsewhere, the defendant,

**FAYE H. JACOB,**

did knowingly and willfully combine, conspire, confederate and agree with others known and unknown, to commit certain offenses against the United States, that is,

    a. to defraud the United States by impairing, impeding, obstructing and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare program;

    b. to violate Title 42, United States Code, Section 1320a-7b(b)(1), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare; and

    c. to violate Title 42, United States Code, Section 1320a-7b(b)(2), by

knowingly and willfully offering and paying remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

### Purpose of The Conspiracy

18.     It was a purpose of the conspiracy for the defendant and her co-conspirators to unlawfully enrich themselves by receiving and paying kickbacks and bribes to patient recruiters and group home owners in exchange for the referral of Medicare beneficiaries for whom the Hospital would submit claims to Medicare.

### Manner and Means of the Conspiracy

The manner and means by which the defendant and her co-conspirators sought to accomplish the purpose and object of the conspiracy included, among other things:

19.     The Hospital would maintain a Medicare provider number that the defendant's co-conspirators would use to submit claims to Medicare for PHP services.

20.     Co-conspirators of the defendant **FAYE H. JACOB** would pay and cause the payment of kickbacks to patient recruiters and group home owners, including the defendant **FAYE H. JACOB,** in exchange for the defendant and other recruiters and group home owners sending Medicare beneficiaries to the Hospital for PHP services.

21.     The Hospital would submit claims to Medicare for PHP services purportedly provided to the Medicare beneficiaries referred by the defendant **FAYE H. JACOB** and other

patient recruiters and group home owners in exchange for kickbacks paid by the defendant **FAYE H. JACOB**'s co-conspirators.

All in violation of Title 18, United States Code, Section 371.

### Overt Acts

23. In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Houston Division of the Southern District of Texas, the following overt acts:

22. In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Houston Division of the Southern District of Texas, the following overt acts:

  a. On or about December 8, 2010, defendant **FAYE H. JACOB**'s co-conspirators paid and caused the payment of approximately $2580.00 to defendant **FAYE H. JACOB** in exchange for **FAYE H. JACOB** sending Medicare beneficiaries to Bright Star PHP for PHP services.

  b. On or about December 9, 2011, defendant **FAYE H. JACOB**'s co-conspirators paid and caused the payment of approximately $5680.00 to defendant **FAYE H. JACOB** in exchange for **FAYE H. JACOB** sending Medicare beneficiaries to Bright Star PHP for PHP services.

  c. On or about January 4, 2012, defendant **FAYE H. JACOB**'s co-conspirators paid and caused the payment of approximately $4280.00 to defendant **FAYE H. JACOB** in exchange for **FAYE H. JACOB** sending Medicare beneficiaries to Bright Star PHP for PHP services.

d.  On or about January 4, 2012, defendant **FAYE H. JACOB**'s co-conspirators paid and caused the payment of approximately $4000.00 to defendant **FAYE H. JACOB** in exchange for **FAYE H. JACOB** sending Medicare beneficiaries to Bright Star PHP for PHP services.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. §§ 982(a)(7), 981(a)(1)(C), and 28 U.S.C. § 2461)

24.  Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to the defendant **FAYE H. JACOB** that, upon conviction for the violation charged in Count One of the Information, the defendant shall forfeit all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of any such offense, including, but not limited to, a money judgment in the amount of at least $1,300,000.00 in United States currency, for which the defendant and her co-conspirators may be jointly and severally liable.

25.  In the event that the property subject to forfeiture as a result of any act or omission of a defendant:

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the court;

    d.  has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of the defendant up to the total value of the property subject to forfeiture, pursuant to Title 21, United States Code,

Section 853(p), incorporated by reference in Title 18, United States Code, Section 982(b)(1), and Title 28, United States Code, Section 2461.

KENNETH MAGIDSON
UNITED STATES ATTORNEY

ASHLEE CALIGONE MCFARLANE
Assistant Chief
U.S. Department of Justice
Criminal Division, Fraud Section
Ashlee.mcfarlane@usdoj.gov
(202) 262-8154